# James Rawlings *vs.* Andrew J. Adams, Exc'r of William Adams.

A father, in 1844, executed a bond to his daughter, then a *feme covert*, by which, after reciting that he had received from her full satisfaction for certain lands therein mentioned which he had recently purchased, but for which he had not received a conveyance, bound himself to execute, without delay, to her, and her heirs and assigns, a deed in fee-simple therefor. In 1845, he took a deed for these lands to *himself and wife, jointly.* The daughter died in 1846. The wife of the father afterwards died, and he married again, and died in 1849, leaving his last wife surviving him, and a will, by which he devised these lands to the only son and heir at law of his said daughter. The daughter and her husband had been in possession of the lands from prior to the date of the bond up to the time of her death, and ever since that period the husband had been in possession thereof, and now holds the same as guardian to his son, the said devisee thereof, at an occupation rent assessed by the orphans court. In 1851, the surviving husband of the daughter sued the executor of the father for a breach of this bond in the lifetime of his wife. Held:

1st. That conceding the right of the surviving husband to sue upon this bond, he is not, under the circumstances of the case, entitled to recover more than *nominal damages.*

2nd. In suits for the violation of contracts like this, such *circumstances* as will tend to show the *real injury* the plaintiff has sustained must be taken into consideration in ascertaining the *quantum* of damages.

3rd. The daughter under this bond had an equitable fee-simple estate in the land, and such an estate in possession would have enabled her and her husband, during her life, to have prevented, by proceedings in equity, any attempt by the father to dispossess them by virtue of his legal title.

4th. After the death of the daughter, her husband, by virtue of his right as tenant by the curtesy, could have prevented by similar proceedings any attempt by the father to dispossess *him.*

5th. Upon the death of the daughter her estate in the land descended, subject to her husband's tenancy by the curtesy, to her son, and the devise to him only gave him the naked legal title, which was all the estate the testator had in the land at the date of his will.

6th. The son, the devisee, under this devise had no more right to interfere with the possession of the husband than the testator had, and it was therefore a voluntary act on the husband's part to relinquish his own possession and take the land as guardian to his son.

7th. The surviving wife of the father has no right of dower in this land, because it was sold by her husband *before* his marriage with her.

To render the plea of *plene administravit* available to an executor to defeat the suit of a creditor, by showing that he has paid over the assets to legatees, it must appear that he has given the six months' notice required by the act of 1798, ch. 101, sub-ch. 8, sec. 13.

To render such plea available, the due publication of the notice to creditors under the order of the orphans court must be established by proof, addressed first to the court, and if the court is satisfied the rules of law have been complied with, the notice then goes before the jury.

If the court doubts in reference to questions connected with the validity of the notice, they may submit the matter to the jury with an instruction that whether they are to regard the notice as evidence, depends upon whether or not they find the disputed point in favor of the notice.

Where the court below permits the notice and order of publication to go to the jury, and exception is taken, the appellate court must decide whether the preliminary proof sanctioned the act.

A notice dated the 25th of January, when the orphans court was not in session, and not passed by said court until the 5th of February, warning creditors to file their claims by the 1st of August following, is defective, because less than six months intervened between the 5th of February, the date of the passage of the order by the court, and the 1st of August.

In an action of debt upon a bond, a prayer, that if the jury find certain facts therein stated, the plaintiff is not entitled to recover any damages for the breach alleged in the declaration, though they may find all the facts offered in evidence by the plaintiff, does not present any question upon the pleadings.

A husband is entitled to curtesy in equitable estates of inheritance of the wife in possession.

Where, upon appeal by the plaintiff in a suit for damages for the breach of a bond, he is entitled to recover no more than *nominal damages*, this court will not award a *procedendo*, though the judgment may be reversed upon some of the rulings of the court below.

APPEAL from the Circuit Court for Howard county.

*Debt* by the appellant against the appellee, brought on the 13th of September 1851, upon a bond, in the penalty of

$10,000, executed on the 1st of January 1844, by William Adams, the defendant's testator, to Elizabeth Rawlings, the then wife of the plaintiff.

This bond recites, that "whereas the said William Adams having received full satisfaction from the said Elizabeth Rawlings for the farm and lands thereunto attached, which he purchased of Caleb Stabler, as trustee of Joseph Bond's property, I bind myself, my heirs, executors and administrators, under the above named penalty, to execute a deed in fee-simple to the said Elizabeth Rawlings, her heirs and assigns, forever, and appoint James Rawlings their trustee." The condition was, "that if the above bounden William Adams, his executors or administrators, do, and shall well and truly, and without fraud or delay, execute a deed in fee-simple to the said Elizabeth Rawlings, her heirs and assigns," then the bond was to be null and void, otherwise to be and remain in full force, virtue and effect.

The breach assigned in the declaration, is the failure of the defendant's testator to convey the land in a reasonable time after the execution of the bond, and that he wholly delayed and omitted to execute and deliver said deed. The declaration further avers, that Elizabeth Rawlings, being the wife of the plaintiff, died on the 21st of June 1846; that the value of the land was $6000 at the time when the said testator ought to have executed and delivered said deed according to the true intent of said bond, and so remained until the commencement of this suit; whereby a right of action hath accrued to the plaintiff to have of the defendant the said sum, yet the said Adams, in his lifetime, and the said defendant, since his death, hath not paid the same, &c. The pleas were, "*non est factum*" and "*plene administravit*," upon which issues were joined.

*1st Exception.* The plaintiff having given evidence to prove the execution, acknowledgment and delivery by said William Adams of the bond in suit, read in evidence the inventory and list of sperate debts returned by the defendant, as executor of said Adams. These papers show the appointment of the

appraisers by the orphans court on the 21st of January 1850, that they took the prescribed oath on the 31st of the same month, and returned the inventory on the 1st of February following, and the executor's oath to the same was made on the 5th of the same month. They also show personal estate to the amount of $2421.25, and sperate debts of $298.32.

The defendant then, to impeach the execution of said bond by Adams, gave proof to show that the same was not signed by him, and then read in evidence the auditor's report, and the defendant's first administration account, dated the 20th of March 1851. In this report the auditor states that he had charged the defendant with the amount appearing due by his first account, and credited him with several legacies bequeathed by the will of said Adams to his daughter, Mary Jane Adams, and his sons, Washington Adams and Andrew J. Adams, the defendant, on the assumption that said legacies were paid or delivered, or formally retained before the issuing of the original writ in this case, and if this assumption be correct, the executor had at the time said writ was issued overpaid the estate the sum of $207.59$\frac{1}{2}$.

The defendant then, for the purpose of showing that, as executor he had paid away the assets of the estate, by paying debts and legacies before notice of the plaintiff's claim, read in evidence the will of the testator, devising negroes and other personal estate to the legatees mentioned in the said auditor's report. This will is dated the 15th of September 1849, and was filed in the orphans court on the 18th of December 1849, and proved on the 1st and 5th of January 1850.

He then offered to read in evidence the order of the orphans court directing him, as executor, to advertise notice to creditors in the Howard Gazette, from the record of proceedings of said court, as of its session on *Tuesday, the 5th of February* 1850. These proceedings show, that the defendant applied to the register, on the 25th of January 1850, for letters testamentary, and that his bond was received by the register and approved by the court, on the 29th of that month, after which the letters were granted him upon his taking the requisite oaths.

They also show the following order of said court: "On appli-
cation of Andrew Jackson Adams, executor of William Adams,
late of Howard District, deceased: It is ordered, that he give
the notice required by law for creditors to exhibit their claims
against the said deceased, and that the same be published
once in each week, for the space of six successive weeks, in
the Howard Gazette, printed in Ellicotts Mills."

The defendant then, admitting that said court was not in
session on the 25th of January 1850, offered to read in evi-
dence his notice to creditors (which was in due form,) of *that
date*, and published in said Howard Gazette for eight succes-
sive weeks, beginning on the 26th of January 1850, at the
same time accompanying his offer with parol proof to show,
that at said date the said Howard Gazette was the only news-
paper published at Ellicotts Mills, and declaring that he pro-
posed to follow up his said offer with proof to show, that
before the institution of this suit or any notice to him of the
plaintiff's said claim, he had paid away all the assets of the
estate in the discharge of debts and legacies.

But the plaintiff objected to the evidence so offered for the
purpose stated, and especially to the proceedings of the or-
phans court directing the advertisement aforesaid, but the
court, (BREWER, J.,) overruled this objection and allowed
the evidence so offered to be given for the purpose aforesaid,
and to this ruling the plaintiff excepted.

*2nd Exception.* The defendant having proved its execution,
offered to read in evidence a written receipt to him by Mary
Jane Adams, dated the 1st of June 1850, for certain negroes
therein mentioned, being the same as those bequeathed to her
by the said will of her father, for the purpose of showing a
delivery of said negroes to her.  The plaintiff objected to the
admissibility of this receipt, but the court overruled the objec-
tion and admitted it in evidence, and to this ruling the plain-
tiff excepted.

*3rd Exception.* The plaintiff then proved, that Elizabeth
Rawlings, the obligee in said bond, was the daughter of said
William Adams, and, at the date thereof, the wife of the

plaintiff, and that she died in June 1846. He then read in evidence a deed for the land mentioned in said bond, from Caleb Stabler, as trustee of Joseph Bond, to William Adams and Barbara Adams, his wife, dated the 8th of April 1845, and proved by the grantor therein that said deed was prepared as a deed to said William Adams and his wife Barbara, at the instance and request of said William Adams, who had previously contracted for the purchase of said land and paid the consideration money therefor. He further proved, that said Barbara Adams died in February 1849, leaving three children, viz., Andrew J. Adams, the defendant, Washington Adams and Mary Jane Adams, and a grandson, Benjamin Rawlings, the son of the plaintiff, and a deceased daughter of said Barbara and William Adams; and further proved, that sometime in the year 1849, the said William Adams married another wife, and died in January 1850, leaving his last wife, who still survives him.

The defendant then proved, that the land so conveyed by the deed from Stabler is the same as that devised by the following clause of the will of the said William Adams: "I give and devise to my grandson, Benjamin Rawlings, son of James Rawlings and my daughter Elizabeth, all that tract or parcel of land lying and being in Montgomery county, State of Maryland, known as Bond's Tanyard Farm, on which James Rawlings now resides, together with the tan-yard and all the improvements thereon;"—that the said Benjamin Rawlings is the only child and heir at law of said Elizabeth Rawlings, the said daughter of the testator and obligee in the bond aforesaid; that the plaintiff and the said Elizabeth had possession of said land from some day prior to the 1st of January 1844, continually, until the death of said Elizabeth, in June 1846, and that the plaintiff has ever since remained in possession thereof, and has been duly appointed guardian for his said son, Benjamin Rawlings, and holds said land as guardian for his said son, and at an occupation rent assessed thereon under the order of the orphans court.

He further offered in evidence his first administration ac-

count, dated the 20th of March 1851, and the receipt of Mary Jane Adams, mentioned in the second exception, also a similar receipt of the same date from Washington Adams, and proved that the negroes named in said receipts were in the possession of said legatees respectively before the year 1851, and were transferred to their names on the tax books of the county between April 1850 and April 1851. He also offered in evidence his second administration account, dated the 19th of September 1853, showing an over-payment to the estate of $230.48¼. Upon the whole evidence, the plaintiff then asked the following instructions to the jury:

1st. That it is competent for the jury to find from the whole evidence that the undisputed debts of the testator were not all settled until the date of the second administration account and after the institution of this suit, and if they so find, then no payment of legacies made by the defendant anterior to said date will protect him from liability in this action, under the plea of *plene administravit.*

2nd. Even if the jury believe from the evidence that the defendant, as executor, delivered over the legacies to Mary Jane and Washington Adams, in June 1850, as a final settlement of said legacies and with intent to pass the title thereof to the legatees, then said delivery will not protect the defendant, as executor, from liability, under the plea of *plene administravit*, if they further find that, with the assets then in hand, he was not then in a condition to pay all the costs of his executorship and the undisputed liabilities and debts of the estate, which, as executor, he did afterwards pay or agree to pay.

The defendant then asked an instruction, which is set out in full in the opinion of this court. The court below rejected the prayers of the plaintiff and granted that of the defendant, and to this ruling the latter excepted; and the verdict and judgment being in favor of the defendant, the plaintiff appealed.

The cause was argued before LE GRAND, C. J., ECCLE-STON and TUCK, J.

*Charles E. Phelps* and *Robert J. Brent* for the appellant.

*1st Exception.* The act of 1798, ch. 101, sub-ch. 8, sec. 13, protects an executor, who after the lapse of one year from the date of his letters, has paid away all the assets in ignorance of other claims: "Provided, that at least six months before distribution, he shall insert in such and so many papers as the orphans court may direct, an advertisement," to the effect of the form given in this section of the law. This manifestly requires that before the executor shall be protected, he shall give to the creditors at least six months' notice, before the day limited for the exhibition of their claims. And under the provisions of this act no notice is legal, unless it is published in such and so many papers as the orphans court may direct. Now, as the defendant admitted that the court was not in session on the 25th January 1850, the day when, by the face of its minutes, the order was passed, and as he offered this order as of the court's session on the fifth of February 1850, it follows that the publications prior to the 5th of February 1850, (when for the first time the court designated the paper and the number of publications) were not legal notices, because not authorized by the court. From the 5th of February, to the 1st August 1850, the day limited in the notice, is short of six months. Therefore, under this act the executor is not protected, because he did not give six months, legal notice to the creditors. Nor is the notice helped by subsequent legislation. The act of 1826, ch. 178, takes from all courts the selection of the particular newspapers in which notices are to be published, but requires the court to designate the place in which such notices shall be published, the number of papers, and the number of insertions in each paper. Now this order does not designate the place, except by designating, in contravention of this last act, the particular newspapers, and this would alone seem to vitiate the notice. But be that as it may, the notice is no legal notice under the original act or this, until previously sanctioned and regulated by the orphans court, and that was not until the 5th of February 1850, at its session on that day,

that is less than six months before the day notified for creditors to file their claims.   The act of 1823, ch. 131, sec. 2, declares, that if creditors shall fail to bring in their claims properly authenticated, by the day limited in the executor's notice, he may make distribution, the same as if he had no knowledge of said claims, that is, the creditor cannot afterwards legally exhibit his claim.   Thus rendering it the more necessary that there should be six months' clear legal notice of the day for filing claims.   Under all these laws, therefore, the court erred in allowing the proceedings of the orphans court, and the notice to be given in evidence for the purpose stated.    But another fatal objection remains.    The plea of *plene administravit*, does not entitle the defendant to show distribution before notice.    The defence should have been by special plea as in 2 *Ev. Har.*, 40.   Judge Story held that the executor, could not under *plene administravit* show payment of inferior debts, before notice of the privileged claim, but he must plead *plene administravit* before notice.   2 *Mason*, 317, *United States vs. Hoar*.   See also 1 *Term Rep.*, 690, *Sawyer vs. Mercer*.   2 *Greenlf. on Ev.*, sec. 346.   *Toller's on Ex'crs*, 269.

2nd *Exception*.  We contend that the receipt of Mary J. Adams was inadmissible, *first*, because if the delivery and payment of this legacy at that date was otherwise legal and proper, yet the fact of such payment could not be proved by the unsworn certificate of the legatee.   Not claiming under her, the plaintiff was entitled to demand direct proof, under oath, by some competent witness, as to the fact of such delivery and payment.   This receipt is merely the acknowledgment of the legatee as to the fact of payment, and as such, *prima facie* evidence against her and all claiming under her, but as to this plaintiff it is *res inter alios acta*.   Entries of third parties are only admissible when ranging under one of two classes, viz: *first*, entries made in the course of official or professional employment; *secondly*, entries or declarations made by private parties in relation to their private affairs.   In the last class of cases, they are admitted as secondary evi-

dence, provided they were against the interest of the party making the entries or declarations, and provided the party is dead at the time of the offer of the declarations. 2 *Am. Lead. Cases*, 289, and cases cited. 4 *Seargeant & Rawle*, 551, *Cutbush vs. Gilbert.* 1 *Greenlf. on Ev.*, sec. 147. *Secondly.* That the receipt if it proves any thing, proves a premature distribution before the lapse of twelve months from the date of defendant's executorship, and before the day advertised for creditors to file their claims, and therefore it is no protection. 6 *Gill*, 443, *Steuart vs. Carr.* *Thirdly.* It is a mere receipt for the possession of the negroes, it does not specify that they are received under the will, or on account of the legacy, it is a mere receipt for the negroes placed in her custody and resumable by the executor, when wanted for the purpose of administration. *Fourthly.* The receipt was not admissible under *plene administravit*, on the authorities referred to under the first exception.

*3rd Exception.* The plaintiff's two prayers relate to the question of assets. They ought to have been granted, because there was evidence of a debt of the testator having been paid and credited in the second administration account, and no proof of its having been paid at an earlier date, and because if the jury had so found, the payment of legacies before the debts were all satisfied, was premature and no protection to the executor, under the doctrine of the case of *Steuart vs. Carr*, 6 *Gill*, 443.

The prayer granted at the instance of the defendant, denies to the plaintiff the right to recover *any damages* for the breach of the bond, provided the jury find the identity of the land devised by Adams to Benjamin Rawlings, and that he was the heir at law of Elizabeth Rawlings, the obligee.

There is no plea of performance. All that is put in issue in regard to the debt, is under the plea of *non est factum.* If it is the deed of the testator, then his breach of the bond is not traversed, and the only remaining defence is *plene administravit*, which always admits the debt. So far as *plene administravit* is involved, the rule is, that in debt on

bond, it not only admits the debt, but the amount claimed: otherwise in *assumpsit*, where the debt must be proved under *plene administravit*, to entitle the plaintiff to more than nominal damages. 2 *Greenlf. on Ev., sec.* 346. *Bull. N. P.*, 140. 1 *Salk*, 296, *Shelley's Case*. There is therefore nothing in the pleadings to deny the breach or the plaintiff's right to maintain the action.

But it is supposed that as this is an action on a bond with collateral condition, and the plaintiff is bound to assign his breaches and the jury to assess the damages, the defendant may, on the question of damages, deny the plaintiff's right to recover any damages, and such is the ground upon which the instruction of the court proceeded. We admit that the real damages must be shown and assessed. But the breach being confessed, and the receipt of the consideration money being shown in the bond itself, we submit that the only question before the jury in assessing the measure of damages was the value of the land at the time it should have been conveyed. 6 *H. & J.*, 301, *Cannell vs. M'Clean*. 9 *Gill*, 251, *Marshall vs. Haney*. The act of 1802, ch. 101, sec. 1, requires, where there is "some other issue joined than upon the subject of assets, the jury shall declare the amount of the debt or demand." Under this act the jury are not to try the right of the plaintiff, but only the *quantum* of the debt or demand. The act of 1785, ch. 80, sec. 13, only allows the jury to find the sum really and justly due to the plaintiff, upon the plea of performance or payment, which is not the case here. Therefore these damages, or rather "the debt or demand," is to be found by the jury under the terms of the act of 1802, ch. 101, sec. 1. What then is the debt or demand due on this bond? and if you choose, to whom is it due but to the plaintiff?

1st. Was the condition of this bond broken, and if so, when? It cannot be regarded as a bond given for natural love and affection. 2 *Story's Eq., sec.* 987. It recites that the obligor "has received from Elizabeth Rawlings full satisfaction for the farm and lands therein mentioned, and the con-

dition is well and truly without fraud or delay to execute a deed in fee-simple, to Elizabeth Rawlings, her heirs and assigns." Now it will be observed that the consideration cannot be enquired into at law, and the executor of the obligor is estopped from denying the payment of the purchase money, or any fact recited in the bond. 11 *G. & J.*, 470, *Newcomer vs. Kline.* 4 *Gill*, 192, *Lloyd vs. Burgess.* The consideration being thus paid in *presenti*, and no time limited for the conveyance, the obligee was entitled to the conveyance in a reasonable time after the date of the bond without any request. 3 *H. & J.*, 165, *Pierpoint vs. Pierpoint.* 2 *Greenleaf's Cruise*, 28, note 2. 2 *Bac. Abr.*, 323. 5 *Seargeant & Rawle*, 375, *Hamilton vs. Elliott.* Therefore a failure to convey in a reasonable time was a breach, but this bond is even more stringent, and requires the conveyance to be "without delay." But in this case the obligor, by taking the deed to himself, and Barbara his wife, in April 1845, disabled himself from conveying the land to Mrs. Rawlings the obligee, and that was a positive breach in itself. 2 *Bac. Abr.*, 310. 2 *Com. Dig. Condition, M.* 3. *Coke Litt.*, 208, *b.* This deed gave the property to Adams and wife by entireties at common law, and in the event of her survivorship, she would be entitled to the whole. 1 *Thos. Coke*, 741, *note L.* 2 *Bl. Com.*, 182. 16 *Johns.*, 110, *Jackson vs. Stevens.* The act of 1822, ch. 162, does not apply to this deed. 4 *Gill*, 506, *Craft vs. Wilcox.* Adams, therefore, disabled himself from making the conveyance as contracted, and though his wife might subsequently die, and the whole title revert to him, yet that could not purge the breach which occurred *eo instanti* he took the deed, as shown by the above authorities. The cases even imply that if before the day appointed for the conveyance, the obligor disables himself, it will be a breach, *(Shep. Touch.*, 389,) but here the obligor on the first of January 1844, bound himself to make the conveyance "without delay," or in a reasonable time at furthest. And more than a year afterwards, while no conveyance had been made by him, and while he was in default, he places the title in

himself and wife, so as to disable himself from making the conveyance. Therefore, it is clear that this bond was broken, and the right of action thereon consummated in April 1845.

2nd. Who is the party entitled to sue for the damages occasioned by this breach? Mrs. Rawlings was alive until June 1846; and that she, suing with her husband in her right, could have maintained a suit in April 1845, is too clear for controversy. A bond given to a married woman as this is, can be sued on by herself and husband, at law, or at least by the husband alone, as a bond given in legal intendment to him. *Hurlstone on Bonds*, 4. 1 *Chit. Plead.*, 34. Mr. Bright says, that upon bonds given to the wife during coverture, the husband may sue jointly with his wife where she is the moving or meritorious cause of action; but the husband must sue alone where the consideration is money paid by her, as the money must belong to the husband alone. 1 *Bright on Husband & Wife*, 63. *Cro. Ja.*, 644, *Abbot vs. Blofield.* 2 *Roll Abr.*, 237, 250. 2 *Maule & Selw.*, 393, *Phillislirk vs. Pluckwell.* 6 *H. & J.*, 31, *State vs. Krebs.* Therefore, it results either that Rawlings and his wife could have sued in April 1845, or that Rawlings himself, during his wife's life, could at that date have sued alone as upon a consideration furnished by him, and an obligation to him alone. In either case his right of action yet survives, because if it is a *chose in action* due to the wife, it enures to his benefit by survivorship, and he may sue for it in his own right. 1798, *ch.* 101, *sub-ch.* 5, *sec.* 8. The bond is therefore valid and the breach consummated in the year 1845.

If such a suit had been brought in April 1845 upon this breach, the measure of damages would clearly have been the value of the land at the time of the breach. 6 *H. & J.*, 297, *Cannell vs. M'Clean.* The condition is to convey to Elizabeth Rawlings, her heirs and assigns. We admit, that if the condition was to convey to her, her heirs and assigns, on a particular day, and she died before the day, the condition would be gratified by conveying to her heir or her assignee if she had conveyed her equitable right. 2 *Bab. Abr.*, 321. But

here the breach occurs in the time of the obligee before death or assignment, and this whether we regard Mrs. Rawlings or the plaintiff, (her husband,) as the true legal obligee. Therefore it is clear, that the obligee of this bond had immediately on its breach a right at law to the value of the land which was not conveyed, or in equity to specific performance as against the obligor. If these premises be correct it follows, that the same right of action remained in the plaintiff alone at the bringing of this suit in 1851, as was vested in him or in him and his wife in April 1845, when the breach occurred.

But it is said that the plaintiff cannot recover, as damages, the value of this land. It was in evidence by the deed from Stabler, that Adams had paid for the land $4360, and by the bond, that Mrs. Rawlings had, while a *feme covert*, in 1844, paid the full value of said land to Adams upon his title bond to her. Until the contrary was shown, this purchase money was *prima facie* evidence of the value of the land in 1845, the time of the breach. There is no evidence of depreciation in the record. It is clear, that if the plaintiff cannot recover this value no one else can. Let us first exclude from consideration the will of the obligor devising this land, in 1849, to his grandson, the heir at law of Mrs. Rawlings. On this hypothesis, and assuming that it was a bond to Mrs. Rawlings, conditioned for a conveyance to her and her heirs, it is said that a conveyance to her heir would discharge it. *Roll Abr.*, 450. *Jones*, 180, *Eaton vs. Butter.* 2 *Bac. Abr.*, 336. And we admit, that a conveyance to the heir will discharge the bond, provided the condition was not broken in the time of the ancestor. But when the bond is broken by the non-performance of a single act stipulated for in the bond, the whole right to damages for the breach is vested in the holder at the time of the breach, and if the holder dies thereafter, the damages go to the executor and not to the heir, as very fully and clearly shown by the authorities. 1 *Maule & Selw.*, 355, *Kingdon vs. Nottle.* 2 *Levinz.*, 26, *Lucy vs. Levington*, and the same case in 1 *Vent.*, 175. *Com. Dig.*, Covenant, *B*, 1. 4 *Maule & Selw.*, 51, *Kingdon vs. Nottle. Ibid.*,

188, *Jones vs. King.* 2 *Thos. Coke,* 45, 46, 47. *Shep. Touch.,* 377, 383, 384. 54 *Law Lib.,* 57. The doctrine of *Lucy vs. Levington,* sustaining the plaintiff's right to sue in this case, is approved by the later English decisions. See 2 *Crompton, Meeson & Roscoe,* 588, *Raymond vs. Fitch.* 12 *Mees. & Wels.,* 718, *Ricketts vs. Weaver.* But if not sustained by these, it clearly is by the American decisions: See 1 *Parsons on Contracts,* 109. *Rawle on Covenants for Title,* 281, 284, 285, 289. 5 *Conn.,* 503, *Mitchell vs. Warner.* Here there is no continuing breach after the death of Mrs. Rawlings, but a perfect and complete breach in April 1845, before her death. Regarding her as the obligee, the damages clearly survive to her administrator, who is the plaintiff, by force of law, and her heir has nothing to do with the damages, although if the conveyance had been duly made, the land might have descended to him, that is, if she had not sold and conveyed it.

The idea is, that assuming the heir could have specific performance, therefore, a devise of the land to the heir is *quasi* specific performance or satisfaction. Our answer is:—*first,* that a court of law cannot consider the equities of the heir. 2 *Story's Eq.,* sec. 790. 2 *White & Tudor,* 26. *Secondly.* That the will does not devise this land to the grandson as a satisfaction of the bond, but as a bounty to him. 2 *Spence's Eq.,* 429. 2 *Story's Eq.,* secs. 1104, 1109, 1119, 1122. *Thirdly.* That this bond is in law a bond to the husband of the obligee, and he having advanced the consideration, he alone is entitled to the damages, and to have the specific performances to such uses as he may designate, the settlement on his wife and her heirs being voluntary on his part, and, so long as unexecuted, revocable by the plaintiff, Rawlings, who has come under no legal or equitable obligation to settle the land on his wife and child, even if he were suing for specific performance as against the obligor.

The instruction is therefore clearly erroneous, as it takes away all right to damages from the plaintiff, by regarding the devise to his son as a satisfaction of the undoubted legal claim arising on the breach of this bond. But even conceding that

the devise to the son and heir of Mrs. Rawlings is a satisfac-
tion, still, by the terms of the bond, the plaintiff was to be the
trustee of the legal title to the land, and in that aspect, entitled
to claim the value of the land for the *cestui que trust,* and
here is evidence of a dower right in the surviving widow of the
obligor, the value of which is clearly chargeable on the land
devised to Benjamin Rawlings, and therefore the devise is only
satisfaction *pro tanto.*

*William H. G. Dorsey* and *Thomas S. Alexander* for the
appellee, argued, as to the *first exception:*

That the court below was right in admitting the proceedings
of the orphans court as offered by the defendant, because they
are sufficiently in accordance with the provisions of the acts
of 1798, ch. 101, sub-ch. 8, sec. 13, and 1826, ch. 178.
These proceedings evidently all took place in the orphans
court, on the 29th of January 1850, when the defendant's
bond as executor was approved by the court, and the mistake
arises from the failure of the register to record them in due
time.   The appraisers swear to their inventory on the 1st of
February 1850, which was before the 5th of that month, and
clearly shows the mistake above mentioned.   The Howard
Gazette was printed at Ellicotts Mills, and was the *only* paper
printed there.   The publication, therefore, was a substantial
compliance with the act of 1798.   The practice under this
law has been, to give the notice to creditors to file their claims
six months *immediately* after the date of the letters, but the
law fixes the end of twelve months as the period at which
claims are barred, but it does not say what *particular* six
months of that time the notice shall be given, provided only
that *some six months* notice is given.   But again, the orphans
courts have the power to direct their *registers* to issue the
order to give notice, and it will be presumed that such was
the case here.

As to the *second exception,* they argued, that the receipt of
Mary Jane Adams, offered by the defendant, was evidence
for the purpose of showing a delivery of the negroes therein

named.   It was a receipt against the interest of the party giving it, and for that reason was admissible.   1 *Greenlf. on Ev., secs.* 117, 120.   3 *H. & J.,* 487, 490, *Prather vs. Johnson.* 2 *H. & G.,* 54, *Carroll vs. Tyler.*   4 *Pick.,* 293, *Shearman vs. Akins.*   11 *Johns.,* 70, *Sherman vs. Crosby.*   A *copy* of this receipt would have been evidence if it had been under seal and acknowledged according to the act of Assembly, but there is nothing in this act which gives to the receipt any *greater force* as evidence because it is so sealed and acknowledged; the object of the act was only to perpetuate receipts so given.   But this same receipt, with another of similar import, was afterwards admitted *without objection,* and it matters not therefore whether the court was right or wrong in this ruling, because the appellant has suffered no injury thereby, and no *procedendo will be awarded.*   8 *Gill,* 370, *Winter vs. Donovan.*

On the *third exception* they argued:—1st, that the court below was right in rejecting the prayers of the plaintiff, because the defendant, as executor, had a right to pay the legacies at any time after returning the inventory, he taking the risk of claims against the estate being presented within the year from the date of his letters.   *Act of* 1798, *ch.* 101, *sub-ch.* 8, *secs.* 13, 14, 15.   By the 10th sub-ch., sec. 8, the executor has the right to deliver specific legacies to the legatee under an order of the court, on the legatee's filing a bond, thereby relieving the executor from all risk and responsibility. The plea of *plene administravit* in this case was in the proper form and is good.   There is no decision to sustain the plea referred to in 2 *Ev. Har.,* 40, but, on the contrary, the act of 1802, ch. 101, sec. 1, shows, that a plea of *no assets* is sufficient to protect the executor in all cases of suits against him, and upon such a plea, in such a case as this, the party suing is bound to show the damages which constitute the debt. Where an executor pays legacies before he pays debts, the administration is defective only as to the *debtor not paid.*

2nd.  The court was right in granting the prayer of the defendant, because the right of action on the bond, if any,

survived to the heir at law, and not to the personal represen= tative. If the husband had any right of action at all, he should have sued as administrator of his wife, for the act of 1798 does not vest in the surviving husband any greater right than he would have had as administrator. The trust estate in the land undoubtedly descended to the heir at law, and he would have had the right to interfere and compel a convey= ance of the legal estate to him, but the father has *devised* the land to him to whom the equitable estate descended, and has thus given him the legal estate. But this action was not brought until after the death of the wife and the land had descended to the heir at law. It was a *covenant running with the land,* and the heir at law therefore is the party really injured, and he alone has the right to sue. Upon this point the learned counsel cited and commented upon the cases of *Kingdon vs. Nottle,* 1 *Maule & Selw.,* 355, 362; *Wotton vs. Cooke, Dyer,* 337, *b; Kingdon vs. Nottle,* 4 *Maule & Selw.,* 53; *Jones vs. King, Ibid.,* 188; *Orme vs. Broughton,* 10 *Bing.,* 533, in 25 *Eng. C. L. Rep.,* 231; *Bamford vs. Hayley,* 12 *East,* 464; *King vs. Jones,* 5 *Taunton,* 418, in 1 *Eng. C. L. Rep.,* 139; *Vyvyan vs. Arthur,* 1 *Barn. & Cres.,* 410, in 8 *Eng. C. L. Rep.,* 113, and *Knights vs. Quarles,* 6 *Eng. C. L. Rep.,* 35, and also the cases cited on the other side.

But if the husband is entitled to sue at all, he can only recover for the breach alleged in his declaration, and nothing more. The declaration does not allege or aver that Adams *could* have conveyed in a reasonable time, nor is there any averment that Rawlings and wife prepared and tendered the conveyance to be executed by Adams, as they were bound to do. *Sugden on Vend.,* 273. *Pierpoint's case,* in 3 *H. & J.,* 165, does not decide the contrary to this, and the question therefore is a new one in this State, and ought to be decided here as it has been in England, that the deed must be prepared by the vendee. If this be so, there was *no breach* of the bond. There is also no proof of *request* on the part of Rawlings and wife. Again, the plaintiff had no right to the land; there is no allegation of any damage done to him or to the estate of

his wife. We had therefore clearly the right to offer any acts of Adams showing a substantial compliance with the condition of the bond in *mitigation of damages*. 1 *Esp.*, 275, *Chelsea Water-works vs. Cowper.* The devise of the land to Benjamin Rawlings, the sole heir at law of Mrs. Rawlings, the obligee in the bond, was in effect a compliance with the condition of the bond, and the plaintiff, if he can recover at all, can only recover *nominal damages*. If we are right in this, the other questions are immaterial, for no *procedendo* would be issued.

ECCLESTON, J., delivered the opinion of this court.

When an executor relies upon a plea of *plene administravit* to defeat the suit of a creditor, to render the plea available by showing that he has paid over the assets to legatees, it must appear that he has given the notice required by the act of 1798, ch. 101, sub-ch. 8, sec. 13. This section provides, that "no executor or administrator who shall, after the lapse of one year from the date of his letters, have paid away assets to the discharge of just claims, shall be answerable for any claim of which he had no notice or knowledge; provided, that at least six months before he shall make distribution, he shall have caused to be inserted in such and so many newspapers as the orphans court may direct, an advertisement," in effect, according to the form given in the section. See also the act of 1823, ch. 131, sec. 2.

The defendant offered in evidence the order of the orphans court of Howard District, directing him to advertise in the Howard Gazette; which order he offered to read from the record of proceedings of that court, as of its session on Tuesday, the *5th day of February* 1850, all of which proceedings, inclusive of that order, are inserted in this record. The entry in reference to the order is: "On application of Andrew Jackson Adams, executor of William Adams, late of Howard District, deceased: It is ordered, that he give the notice required by law for creditors to exhibit their claims against the said deceased, and that the same be published once in each week, for the space of six successive weeks, in the Howard Gazette, printed in Ellicotts Mills."

After admitting the orphans court was not in session on the 25th of January 1850, the defendant offered to read in evidence to the jury his notice to creditors, dated on that day, and published in the Howard Gazette for eight successive weeks, commencing on the 26th of January 1850. At the time of this offer it was accompanied with proof to show, that when the notice was advertised, the Howard Gazette was the only newspaper published at Ellicotts Mills. The defendant also declared, that he proposed to give evidence for the purpose of showing that before the institution of this suit, or of any notice to him of the plaintiff's claim, he had paid away all the assets of the estate in discharge of debts and legacies.

But the plaintiff objected to the evidence offered for the purpose stated, and especially to the proceedings of the orphans court directing the advertisement in the Howard Gazette and to the notice published. The court, however, overruled the objection and allowed the evidence so offered to be given for the purpose stated. And this decision constitutes the first exception.

In such a case, if the plea of *plene administravit* can avail the defendant, the due publication of notice to creditors, under the order of the orphans court, is necessary to be established by proof, which, in the first instance, is addressed to the court, and if they are satisfied that the rules of law have been complied with, the notice then goes before the jury. If, however, in the preliminary examination, the court entertain doubts in reference to questions connected with the validity of the notice, the court may submit the matter to the jury, with an instruction, that whether they are to regard the notice as evidence before them, must depend upon whether they do or do not find the disputed point in favor of the validity of the notice. 1 *Md. Rep.*, 123, and 5 *Ibid.*, 418.

When, as in this case, the court permit the order of the orphans court and the publication to go to the jury, if exception is taken, the appellate court must decide whether the preliminary proof sanctioned the act. And here we think it did not. The notice is dated the 25th and was advertised for the first time on the 26th of January 1850. The orphans court was

Rawlings vs. Adams.

not in session the day on which the order bears date, and it appears as part of the proceedings of that court on the 5th of February, according to the record of the minutes or proceedings. With such proof we cannot say, that on the 26th of January, when the notice was first inserted, it was given under the order of the orphans court. Their order, according to their record, was passed on the 5th of February; and the notice is clearly defective, because it warned the creditors to exhibit their claims on the 1st day of August following, which was less than six months after the order of the court. And under this view, the court below were wrong in overruling the objection of the plaintiff and permitting the proof to go to the jury.

Having thus disposed of the first exception, there is no necessity for expressing any opinion in regard to the question presented by the second bill of exceptions, nor in reference to the two prayers of the plaintiff contained in the third, as they were submitted under the supposition or assumption, that the notice to the creditors was regularly in evidence.

At the instance of the defendant the court granted an instruction: "That if the jury shall find from the evidence that the land devised by the last will and testament of William Adams unto his grandson, Benjamin Rawlings, son of James Rawlings, and his, the testator's, daughter Elizabeth, and therein described as all that tract or parcel of land lying and being in Montgomery county, State of Maryland, known as Bond's Tanyard Farm, on which James Rawlings now resides, together with the tanyard and all the improvements thereon, is the same land which is described in the supposed obligation on which the plaintiff has declared; and that the said Elizabeth died in the lifetime of the said William Adams, and that the said Benjamin Rawlings, the devisee, is the only child and heir at law of the said Elizabeth Rawlings, then the plaintiff will not be entitled to recover any damages for the breach of the condition of the said supposed writing obligatory alleged in the declaration, even although the jury shall find that the said instrument declared on was the deed of the said William Adams, deceased, and all other facts offered in evidence by the plaintiff."

According to the doctrine recognised in *Dorsey vs. Dashiell*, 1 *Md. Rep.*, 207, 208, as settled by the cases there referred to, this prayer does not present any question for decision upon the pleadings. The position it assumes is, that although the jury should find the bond sued upon was executed by William Adams, and they should also find all other facts offered in evidence by the plaintiff, still he was not entitled to recover any damages, provided they should find the land devised by William Adams to his grandson, Benjamin Rawlings, the son of his daughter, Elizabeth Rawlings, to be the same land which is described in the bond, and that the said Elizabeth Rawlings is the obligee in the bond, and died in the lifetime of William Adams, leaving Benjamin Rawlings, her only child and heir at law.

When the prayer is viewed in connection with the proof in the cause, it necessarily asserts the proposition, that even if the condition of the bond was broken in the lifetime of Mrs. Rawlings, the surviving husband could not recover any damages for such breach, but the right of action passed to the heir at law of the wife. No case has been adduced in which the right of the surviving husband, as such, was under consideration in regard to covenants relating to land, but in the cases referred to, where breaches had occurred whilst the covenantees were living and the suits instituted after they had died, the inquiry has been, whether the right of action belonged to the personal representatives or descended to the heirs at law?

In the case of *Lucy vs. Levington*, 2 *Lev.*, 26, and 1 *Vent.*, 175, where the covenant was for quiet enjoyment, and the covenantee, himself, was ejected, the court held the executor to be the proper party to take advantage of the covenant. The decision in *Lewes vs. Ridge*, *Cro. Eliz.*, 863, is very similar in principle. But in *Kingdon vs. Nottle*, 1 *Maule & Selw.*, 355, the executrix sued for a breach of the covenant for seizin, and upon demurrer to the *nar*, the demurrer was ruled good, because no other damage had been alleged than such as arose from a breach of the defendant's covenant that he had a good title, the *nar* containing no allegation of special damage to the estate of the testator in his lifetime. Upon a suit by the same

plaintiff as devisee, reported in 4 *Maule & Selw.*, 53, it was argued for the defendant, upon demurrer, that inasmuch as the covenant for seizin was broken as soon as made, no right of action could pass to the devisee; but the court held, that it was a continuing breach so long as the defendant had not a good title, and notwithstanding there might have been a technical breach during the life of the testator, yet the substantial breach occurred after his decease, which conferred upon the devisee the right to sue, she being the party materially injured.

In *King vs. Jones*, 5 *Taunt.*, 418, under a covenant for further assurance on request, the purchaser requested that a fine might be levied, which was not done. The ancestor was not evicted, but after his decease the heir was. The court held, that the heir could maintain the suit. After citing *Fitz-herbert*, *N. B.*, *Writ of Covenant*, *p.* 341, *C*, and the case of *Sir Anthony Cooke*, *Dyer*, 337, also reported in *Anderson*, 53, Justice Heath, in delivering the opinion of the court, refers to *Kingdon vs. Nottle*, in 1 *Maule & Selw.*, 355, and says: "The court there follow the doctrine of *Lucy vs. Levington*, and they advert to the circumstance which differs that case from this, that there the ultimate damage was sustained in the time of the ancestor, and therefore the land did not descend to the heir." From this it would appear, the English judges were not disposed to overrule the decision in *Lucy vs. Levington*. And if the case of *Kingdon vs. Nottle*, in principle, should be considered in conflict with it, an inclination to sustain the doctrine of the former decision has been manifested in *Raymond vs. Fitch*, 2 *Crompt., Mees. & Ros.*, 596, and *Ricketts vs. Weaver*, 12 *Mees. & Wels.*, 718.

Speaking of *Kingdon vs. Nottle*, Chancellor Kent does not assent to the correctness of the idea, that a covenant of seizin runs with the land and the assignee may sue, because want of seizin is a continuous breach. He says, "The reason assigned for this last decision is too refined to be sound. The breach is single, entire and perfect in the first instance." 4 *Kent's Com.*, 472, *marg'l p.*, (7th Ed.) See also *Rawle on Cov.*, 284, 285, 289, and the cases referred to in note 4 on page 489.

Rawlings *vs.* Adams.

In 1 *Parsons on Contracts*, 109, we find it stated, that in covenants relating to the freehold, where the covenant is *collateral or in gross*, and the breach occurs either before or after the death of the covenantee, the personal representative must sue, and not the heir. But, "for the breach of a covenant *which runs with the land*, the heir must sue, if the breach occur *after* the covenantee's death, the personal representative if it occur *before*." This author then says, "the doctrine of a continuing breach, for which the heir or assignee may recover, if the ultimate and substantial damage is suffered by him, was established in England, by the case of *Kingdon vs. Nottle*, but it has not been adopted in this country."

The plaintiff insists, that his right to recover is sustained by the later English decisions, but if not by them, it certainly is by the American authorities. And not only does he claim a right to some damages, but to the extent of the full value of the land at the time when it should have been conveyed. We do not think it necessary to decide whether that which, in argument, has been called the English doctrine, or that called the American doctrine, prevails in this State, because conceding to the plaintiff the full benefit of the latter, in our opinion he is not entitled to more than nominal damages, under the proof in the cause.

The case of *Cannell vs. M'Clean*, 6 *H. & J.*, 297, has been very much relied upon by the plaintiff in support of his claim for damages to the value of the land. But that was a suit upon a bond, in which Cannell, the defendant, bound himself to convey, on a particular day, to M'Clean the plaintiff, a lot of woodland. It does not appear that the latter ever had possession of or derived any benefit or advantage from the land. Nor did he receive any conveyance of the title.

In *Dyer vs. Dorsey & Edelen*, 1 *G. & J.*, 440, Henry Anderson had sold to Campbell and Ritchie, a parcel of land, and H. H. Chapman, as their agent, sold the same to Dorsey, who sold, and by deed conveyed it to Dyer. Dorsey and Edelen, (the defendants,) entered into the agreement sued upon, by which they covenanted that during the month of

7      v.7

August, a deed should be executed to Dyer, for the purpose of conveying to him the title of Campbell and Richie, in the land; the defendants binding themselves to the performance of the covenant under the penalty of two thousand dollars. The price contracted to be paid by Dyer for the land was $2500. At the trial the plaintiff claimed the penalty of the bond, and asked an instruction to the jury, sustaining that view of the case. The court, however, refused the instruction, and held, that the sum which it might be necessary to pay for obtaining the title of Campbell and Ritchie, would furnish the true measure of damages, the proof of which was upon the plaintiff. And this ruling was affirmed in the Court of Appeals. The case of *Cannell vs. M'Clean,* was relied upon by the appellant, but Judge Archer in delivering the opinion of the court, says, "the value of the land at the time of the breach of the contract ought not, as has been contended, to constitute the measure of damages, for such a rule applied here, would work this injustice. The plaintiff would obtain the value of the land, and would moreover hold Dorsey's right and title, having obtained a conveyance for the same, and would be left in possession of the land." And after stating the circumstances, the judge adds, "these facts show how essentially this case varies from the case of *Cannell vs. M'Clean.*"

In *Tanner vs. Livingston,* 12 *Wend.,* 83, 96, the defendant having in fact only a life estate, but believing it to be in fee, conveyed the property with a covenant of seizin in fee. In a suit upon the covenant, it appeared that the plaintiff, from the date of the conveyance, had been in possession, and had the exclusive occupation and enjoyment of the premises. He was allowed by the court below to recover the consideration money, but without interest. For the purpose of reducing the amount of the verdict, the counsel for the defendant offered to prove the value of the life estates, but the court refused to permit him. This ruling was reversed in the Supreme Court; where they say, "the court however erred in not admitting the evidence of the value of the life estates, as the plaintiff's title to that extent is valid."

So in *Rickert vs. Snyder*, 9 *Wend.*, 416, in a suit on a
covenant of warranty, the plaintiff having been ousted of a
part of the premises by a party having superior title, but only
for a term of years, the Supreme Court held, that the con-
sideration money paid, and interest, could not be recovered,
(according to the general rule in that State, in regard to
damages for breaches of covenants relating to land titles,)
but the annual value of the land, or the interest on the pur-
chase money for the period of the term, together with the
costs and counsel-fees of the plaintiff's defence to the suit of
the termor.

The cases referred to are quite sufficient to show, that the
rule adopted in *Cannell vs. M'Clean*, in regard to the measure
of damages, cannot with propriety be applied to such a case
as this. Whenever suits are instituted for violations of con-
tracts similar to this, in ascertaining the *quantum* of damages,
such circumstances as will tend to show the real injury which
the plaintiff has sustained, must be taken into consideration.
The correctness of this position is very fully sustained by
Mr. Sedgwick, in his work on the *Measure of Damages*, at
page 180. He there says, "In regard to all the real cove-
nants, although the courts have felt themselves bound to
adopt the arbitrary rules which we have stated, as to the price
paid, still the constant effort is to give compensation for what
is actually lost, not to allow any remuneration for a mere
technical breach of agreement; and in all cases to make the
measure of damages correspond with the real injury sus-
tained." That the writer is justified in making this remark,
will appear from the cases examined by him in several pre-
vious and subsequent pages.

When this principle is applied to the circumstances dis-
closed in the record before us, we think the plaintiff is shown
to be entitled to nominal damages only.

The bond recites that, "Whereas the said William Adams
having received full satisfaction from the said Elizabeth
Rawlings, for the farm and lands thereunto attached, which
he purchased of Caleb Stabler, as trustee of Joseph Bond's

property, I bind myself, my heirs, executors and administra-
tors, under the above named penalty, to execute a deed in
fee-simple to the said Elizabeth Rawlings, her heirs and
assigns; forever, and appoint James Rawlings their trustee."

This instrument is dated the 1st of January 1844. Accord-
ing to the evidence, it appears the plaintiff and his wife had
possession of the land continually, from some day prior to the
date of the bond, until the death of the wife, which occurred
in June 1846. After this statement of the proof, the third
bill of exceptions proceeds thus: "And that the said plain-
tiff has ever since remained in possession of said land, and
that said plaintiff has been duly appointed guardian for his
said son, and holds said land as guardian for his son, and at
an occupation rent assessed thereon, under the order of the
orphans court." When the holding as guardian, and at a
rent, commenced, does not appear.

The recital in the bond discloses or furnishes written evi-
dence of a sale of the farm. Which farm, the proof shows,
was then in the possession of the plaintiff and his wife. She
then, under the contract as contained in the bond, had an
equitable fee-simple estate in the premises. And this, as we
must suppose, with the approbation and consent of the plain-
tiff; for he, it seems, with her, continued to hold the property
until her decease; and after that he still remained in posses-
sion. Such an equitable estate in the wife, in possession,
would have enabled husband and wife, during her life, to
have prevented, by a proceeding in equity, any attempt on
the part of William Adams, to dispossess them, by virtue of
his legal title. And after the death of the wife, if Adams
had made a similar attempt to dispossess the plaintiff, he, in
virtue of his right, as tenant by the curtesy, in the equitable
estate, would have been protected by a court of equity.
Upon the decease of the wife, whatever estate she had in the
premises, subject to the husband's right as tenant by the
curtesy, descended to her only child Benjamin Rawlings:
and the devise to him by William Adams, his grandfather,
could have no other effect but to pass to him the naked legal

title: that being all the estate remaining in Adams at the date of his will, and at the time of his decease. Consequently, under that devise, Benjamin Rawlings had no more authority to interfere with the possession of the plaintiff than the testator had. And therefore it was a voluntary act on the part of the plaintiff, when he relinquished his own possession, and took the farm, as guardian to his son, at an occupation rent.

Under such circumstances, admitting the plaintiff's right to sue, and considering the failure to convey the naked legal title within a reasonable time after the contract, to have been a breach of the bond, what actual loss has been sustained to entitle him to more than nominal damages?

Instead of perceiving any equitable circumstances in favor of this claim, it appears to us to be based, exclusively, upon a mere technical breach, resulting from a failure to convey the legal title, *in due time*, according to the condition of the bond.

William Adams executed the bond, binding himself to convey to his daughter a parcel of land in fee-simple: the daughter and her husband then in possession, and so continuing until her decease. After which the husband remained in possession until he became voluntarily, in the character of guardian to his son, a *quasi* tenant to the son; the obligor in the bond having devised the land to that son, who was the sole heir at law of his mother, the obligee, to whom the land was to have been conveyed in fee. Up to this point the plaintiff had acquiesced in his wife's right to the land under the bond. He had instituted no suit asserting his right, if he had any, to damages for a breach of the bond, either as surviving husband, or because he was entitled to the bond, from the time of its execution, by virtue of its provisions. There is no evidence of any such claim having been made, until the institution of this suit, in September 1851, nearly two years after the decease of William Adams, and after the assetts of his estate had been exhausted in the payment of debts and legacies. At least there is evidence tending to

show that such was the fact. It is true, the executor, in giving notice to the creditors to exhibit their claims, did not comply strictly with the requirements of the law, and consequently he would be responsible for the claim, if valid.

It has been said, that the widow of William Adams is entitled to dower in this land, and even if the devise is to be considered in the light of performance or satisfaction, of the bond, it can only be so in part, because subject to the dower. But if the facts are correctly stated in the record, there is no such right of dower, because, before the marriage the land was sold. 1 *Bright on Husband & Wife,* 359. *Lloyd vs. Lloyd,* 2 *Connor & Lawson,* 599, 600, and 4 *Drury & Warren,* 370, 371.

In the previous part of this opinion we have spoken of the rights of the plaintiff as tenant by the curtesy. That a husband is entitled to curtesy in equitable estates of inheritance, in possession, will appear by reference to 1 *Bright on Husband & Wife,* 120, 135.

In consequence of the error in the first bill of exceptions, we reverse on that, but a *procedendo* will not be granted, because the plaintiff would not be entitled to recover more than nominal damages.

With our views on the subject, it is unnecessary to decide whether the court were right or not in granting the defendant's prayer. It asked the court to instruct the jury, if they believed the facts as stated, the plaintiff could not recover *any damages.* If the prayer was erroneous to any extent, it could only be so, in our opinion, because the plaintiff had a right to nominal damages. And a reversal on that account would not induce us to send the case down for a second trial.

*Judgment reversed,*
*but no procedendo awarded.*